1

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
2                     RICHMOND DIVISION


3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     :
4   JOCELYN AZZI                     :
                                     :
5   v.                               :   Civil Action No.
                                     :   3:08CV00755
6   PALISADES COLLECTION, LLC        :
                                     :   May 6, 2009
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:


8

        COMPLETE TRANSCRIPT OF SUMMARY JUDGMENT MOTION
9          BEFORE THE HONORABLE ROBERT E. PAYNE
                UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  Leonard A. Bennett, Esq.
    Matthew Erasquin, Esq,
13  Consumer Litigation Associates
    12515 Warwick Blvd., Suite 100
14  Newport News, VA   23606
    and
15  Jason M. Krumbein, Esq.
    Krumbein Consumer Legal Services
16  1650 Willow Lawn Drive, Suite 300
    Richmond, VA   23230

17
                Counsel on behalf of the plaintiff
18
    John C. Lynch, Esq.
19  Troutman Sanders
    150 W. Main Street, Suite 1600
20  Norfolk, VA   23510
    and
21  Jonathan S. Hubbard, Esq.
    Troutman Sanders
22  1001 Haxall Point
    Richmond, VA   23218

23
                Counsel on behalf of the defendants
24
                   DIANE J. DAFFRON, RPR
25                 OFFICIAL COURT REPORTER
               UNITED STATES DISTRICT COURT
```

1          (The proceedings in this matter commenced at

2   9:30 p.m.)

3

4          THE CLERK:  Civil Action No. 3:08CV00755,

5   Jocelyn Azzi v. Palisades Collection, LLC.

6          Mr. Leonard A. Bennett, Mr. Jason M.

7   Krumbein, and Mr. Matthew Erasquin represent the

8   plaintiff.  Mr. John C. Lynch and Mr. John Hubbard

9   represent the defendant.

10          Are counsel ready to proceed?

11          MR. BENNETT:  Yes, Your Honor.

12          MR. LYNCH:  Yes, Judge.

13          THE COURT:  All right.

14          MR. BENNETT:  Judge, you have cross summary

15   judgment motions and cross evidentiary motions.

16          The plaintiffs, please, start first, but

17   we'll defer to the Court's preference.

18          THE COURT:  This courtroom, they have got

19   that thing off-centered there.  It's supposed to be

20   over here.  We don't need to do it today.

21          THE CLERK:  The lectern, you mean?

22          THE COURT:  Yes.  It's all skewed.  All

23   right.

24          Well, we have some evidentiary issues that

25   have an impact on here.  Are you all still fighting

1  about these things or have you got it straight?

2          MR. BENNETT:  We're still arguing, Judge.

3          THE COURT:  Why are you arguing over things

4  like that?  You ought to be able to read the rules and

5  settle these things without having to make all these

6  motions.

7          All right.  The first thing is the Neal

8  affidavit.

9          MR. BENNETT:  Your Honor, as the Court

10  certainly knows from the briefing, in my opinion the

11  clearest argument is the Burlington or Rambus Rule

12  37(c)(1) objection.  Mr. Neal was never disclosed as a

13  witness.  The defendant answers that primarily by

14  saying that his name was mentioned in a deposition of

15  another employee of the defendant.

16          THE COURT:  Disclosure is made in Rule 26

17  fashion of people whom you may use to support your

18  defense.  And if you don't do it, that's it.  And it's

19  real clear what the rule requires to be done.

20          What explanation was given for why that

21  witness wasn't disclosed?  Any?  I didn't read any.

22          MR. BENNETT:  Well, Judge, in the briefing,

23  the explanation given -- there was no explanation given

24  at all.  It was an attempt at an explanation.  And, in

25  fact, there has never even been a supplemental

1  disclosure.

2           THE COURT:  They didn't disclose.  So the

3  question then is:  Were you surprised?  They don't have

4  any reason for failing to disclose it.  Were you

5  surprised?  How can you cure it?  How will it disrupt

6  the trial?  And the importance of the testimony under

7  the Southern States test, right?

8           MR. BENNETT:  Yes, sir.

9           THE COURT:  Okay.  So what is the answer?

10          MR. BENNETT:  We were surprised because our

11  opposition to the evidence that the Neal affidavit

12  tries to offer to the Court, it has been the

13  significant strategy I've taken in the way that we've

14  litigated the case.  That is, there's no doubt in our

15  side's view that this was never Ms. Azzi's account.

16  But had the defendant begun the case by saying, Look,

17  we have evidence that it was her account.  Mr. Neal

18  keeps our records and maintains them.  Here is what

19  documents we have."  Then our position would have been

20  different in a lot of ways.  It probably would have

21  been different as to the depositions that we took.

22          THE COURT:  It wouldn't have been different

23  as to whether it was her account.

24          MR. BENNETT:  It would not been different to

25  that, but our preparation for --

1          THE COURT:  Your preparation would have been

2  different.

3          MR. BENNETT:  Our discovery would have been

4  different and our preparation.  And certainly in this

5  instance, Judge, that should be, I think, patently

6  obvious because that's the single focus, almost

7  single-handed focus, of their summary judgment

8  arguments is that this somehow -- could be construed as

9  her account.

10          And being forced now to challenge this

11  evidence when it was never disclosed and, in fact,

12  another good example, Judge, with respect to the

13  ability to cure at this point is that Chase wasn't even

14  considered or attempted by either side as a third party

15  witness in this case.

16          We would have to open an entire new chapter

17  of the case to go back and to discover the whole

18  history of these documents from Chase.

19          MR. LYNCH:  Let me see I can I can -- Judge,

20  I hate to interrupt.  John Lynch for Palisades.  I have

21  been considering this issue.  I'm going to withdraw the

22  Neal declaration.  He was not disclosed.

23          THE COURT:  No, he wasn't.

24          MR. LYNCH:  He was not disclosed.  That was

25  an inadvertent mistake by Palisades.  We don't think it

1   will necessarily affect our case.  The documents we

2   need in this case we can get through Monica Bey.

3           THE COURT:  The Neal affidavit is withdrawn.

4   I wish you considered that some other time.  Your

5   client didn't disclose it, and they have no reason for

6   not disclosing it.  First, that's the starting point

7   for that analysis is you're behind the eight ball when

8   you do that.  Particularly when you're going to rely on

9   that person.  And you've got to have a reason.  And if

10  you know it's going to require discovery, then --

11          MR. LYNCH:  I understand, Judge, and I

12  apologize for that.

13          THE COURT:  All right.  So that's withdrawn.

14          That didn't cost anybody but me and my law

15  clerk an extra three or four hours of work.  But that's

16  all right.

17          Now, the Monica Bey declaration,

18  Mr. Bennett.

19          MR. BENNETT:  Judge, the Monica Bey

20  declaration, we have provided the actual deposition

21  itself.  The testimony that Monica Bey offered is that

22  she did not know of any documents.  She didn't recall

23  any documents that were considered or used.

24          In addition --

25          THE COURT:  Wait a minute.  What you cite is

1  paragraph -- let's see.  The first contradiction we

2  look at is by comparing paragraph 4 of the affidavit.

3  Paragraph 4 reads, "As director of collections and as

4  an employee of Palisades for approximately eight years,

5  I am familiar with the creation and maintenance of the

6  records of Palisades."  And then you cite some pages

7  from her deposition.

8          What it says is, "Have you had an opportunity

9  to determine if there are any original documents?  That

10 is, any account record documents for the Azzi account,

11 credit card applications or charge slips, anything with

12 signatures on it at all?"

13          Answer:  "I don't recall."

14          "And so I've asked you," is the next

15 question, "if there are any account records that have a

16 signature pertaining to this Azzi account.  And your

17 answer is you do not recall.  Right?"

18          "I don't recall," is the answer.  "I don't

19 recall what documents I've pulled on this."

20          Now, that's not inconsistent with what she

21 said.  What happened is she gave an answer.  You didn't

22 listen to the answer.  You didn't follow it up.  You

23 didn't go chase it and say, Tell us whether there are

24 any of these documents are not.  But it's not

25 inconsistent.  She just simply said, "I don't recall."

1 That's what it seems to me to say, isn't it?

2          MR. BENNETT:  Well, it does say as of March

3 19th she does not recall.  The witness, Judge, in her

4 declaration has to establish under Rule 56(c) and (e)

5 that it was made on her personal knowledge.  And to the

6 extent that she acknowledges on March 19, a week before

7 that deposition, that she doesn't have any recollection

8 of any such documents.

9          THE COURT:  Is that how you briefed this?  As

10 a failure of personal knowledge that is disclosed by

11 the inconsistency?  I thought you briefed it because it

12 was substantively inconsistent.

13          MR. BENNETT:  We briefed it in both regards,

14 Judge, but you're right with respect to the substantive

15 inconsistency.  That's the principal argument that we

16 make.

17          THE COURT:  And it's not substantive

18 inconsistent.  She just says she doesn't recall what

19 documents she pulled on this.

20          MR. BENNETT:  For that basis, Judge, in our

21 original briefing, you're correct.  With respect to

22 that component --

23          THE COURT:  Well, when you reread this

24 getting ready for the argument, didn't you want to say

25 something like, Boy, did I mess that up?  I shouldn't

1 have briefed it that way.  I'm going to get up and say,

2 Look, I'm not making that argument anymore.

3          MR. BENNETT:  Judge, I believe that it is

4 inconsistent.  I think that if a week before she says

5 "I don't have any knowledge of these documents.  I

6 don't recall any documents," and then a week later

7 says, "Here are the documents that we have" --

8          THE COURT:  She went back and found them.

9          MR. BENNETT:  Well, there's no evidence that

10 she did that.  That is, in order for the Court to

11 extrapolate by inference, it has to have at least some,

12 which is sort of duplicative, but it would have to have

13 some circumstantial evidence to do so.  You don't have

14 that in her declaration.  Her declaration doesn't say

15 "Here is how I came to this personal knowledge.  I went

16 back and I looked at what documents exist."

17          The only thing that Your Honor has before it

18 is, first, her testimony from March 19 where the

19 witness says, "I don't have knowledge of what these

20 documents are."  And then a week later when she says,

21 "Here are the documents that exist."

22          The argument that the defendant would make

23 that theoretically it might not be inconsistent isn't

24 fleshed out and supported by her declaration.  We begin

25 reading her declaration with the knowledge that we had

1  prior to that, which is --

2          THE COURT:  Is she a 30(b)(6) witness?

3          MR. BENNETT:  She was offered as a 30(b)(6)

4  witness, Judge.

5          THE COURT:  It was her duty to recall -- it

6  was her duty to go find out.  If she didn't find out,

7  there's a way to deal with this.  You know, she's

8  supposed to know these things.  When she is appointed

9  as a 30(b)(6) representative of a company, it's her

10 duty to go find out what she pulled.  And she can't get

11 away with saying "I don't recall."  And if she does,

12 it's sanctionable, and you can come and move for

13 sanctions, but you didn't do any of that.

14         MR. BENNETT:  But we did, Judge.  We have

15 moved under this objection for that.  We don't have

16 to --

17         THE COURT:  No, you have to do it as a remedy

18 to the 30(b)(6) default.  You see, under 30(b)(6), it's

19 the job of a witness to go get the knowledge of the

20 corporation.  And if the witness, if you give a proper

21 notice of a subject, and this is encompassed within the

22 subject, and she says, "I don't know," then they have

23 violated their responsibility under Rule 30(b)(6), and

24 you come and you move for sanctions.  And the sanctions

25 are that they put up somebody who knows what's going

1  on, and who has found out the information, and they pay

2  for your fees for having to come back and take the

3  deposition.  Or you can ask for other sanctions, such

4  as striking the testimony.  But you do that after the

5  deposition and the person that has been ponied up by

6  the corporation hasn't given an answer that's within

7  the scope of the designation.

8          MR. BENNETT:  Judge, with all due respect,

9  that is what we would pursue if we believe the

10  corporation had more knowledge that that witness had

11  not disclosed.  We can also take the position that the

12  witness told the truth.  She is speaking -- when she

13  says, "I don't know," as a 30(b)(6) designee, she is

14  saying "Palisades does not know."  I could seek --

15          THE COURT:  She said, "I don't recall."

16          MR. BENNETT:  Well, "I don't recall.

17  Palisades does not have that recollection."  And that's

18  an answer, Judge.

19          THE COURT:  That ain't how it works.

20          MR. BENNETT:  Well, if the 30(b)(6) deponent,

21  Judge, testifies that the corporation does not have any

22  record of something, then it's bound by that.  That's

23  what we're seeking to so bind.

24          THE COURT:  True, but she didn't say that.

25  She didn't say, "We don't have any records."  She said,

1  "I don't recall what I pulled."  You just didn't follow

2  through with the question.

3          MR. BENNETT:  Actually, Judge, we asked the

4  question, and then we included this in the materials.

5  We then spoke to lead counsel, who is not here, but

6  lead counsel, who then stipulated on the record that

7  the defendant did not have any such documents because I

8  didn't want to play that cat and mouse game.

9          THE COURT:  That's different.  Where is that

10  stipulation?

11          MR. BENNETT:  It's within the -- and it's

12  actually cited within the summary judgment briefing as

13  well.

14          THE COURT:  Well, I don't think it's cited

15  within the briefing on -- maybe I missed it.  If they

16  stipulated that they don't have any evidence after a

17  30(b)(6) witness says they didn't recall it, then they

18  can't put the evidence on, and it's that simple.

19          Is that stipulated, Mr. Lynch?  If it was,

20  it's over.

21          MR. LYNCH:  No, Judge.

22          THE COURT:  O-v-e-r, over.

23          MR. LYNCH:  No, Judge, and I need to look at

24  the page he's referring to in the stipulation.  That's

25  not my recollection at all.

1          THE COURT:  Where is it?  It ends it.  It's

2  over if that's the stipulation.

3          MR. BENNETT:  It was the stipulation, Judge.

4          THE COURT:  Let me have it.  Where is it?

5          MR. LYNCH:  Judge, there is a stipulation in

6  there that at that time we did not have the Chase

7  application.

8          And that may be what you're referring to.

9          MR. BENNETT:  No, it's in the documents.

10         Judge, the part of the deposition that Your

11 Honor is referring to, the part of "do not recall," and

12 this is identified in our -- this is the Monica Bey

13 deposition that is attached as an exhibit to our

14 summary judgment pleading.

15         Our opposition to defendant's motion for

16 summary judgment as Docket No. 47-8.  The deposition of

17 Monica Bey, the copy that we attached, Your Honor has

18 just gone through its account of the "I do not recall"

19 testimony.  And right after that --

20         THE COURT:  Wait a minute.  What page is it?

21         MR. BENNETT:  Page 19 of 47-8.

22         THE COURT:  Page 19.

23         MR. BENNETT:  You'll recall at the time we

24 did not have the final deposition that was later filed,

25 but the --

1          THE COURT:  Look, quit talking until I find

2   it.  There's nothing on page 19 that I can find.  What

3   is it?

4          MR. BENNETT:  Line -- actually, it's page 19

5   on the printout, but it's deposition page 46, but it's

6   line 1.

7          THE COURT:  It's deposition page 46.  Let me

8   find it.  All right.

9          MR. BENNETT:  Actually -- proceed at 45, I

10  asked, "And you don't have any" --

11          THE COURT:  Start with the page and the line

12  so I can follow you.  What page?

13          MR. BENNETT:  The bottom says 19, but the

14  deposition page that I'm looking at --

15          THE COURT:  I'm looking at the deposition.  I

16  got it right in front of me.  Now, what page?

17          MR. BENNETT:  45, Judge.

18          THE COURT:  What line?

19          MR. BENNETT:  Line 20.

20          THE COURT:  Line 20.  "How would someone go

21  about doing that?  Who is your contact at Chase?"  That

22  is two different questions.

23          MR. BENNETT:  Judge, the 47-8 attachment to

24  which I'm referring --

25          THE COURT:  I don't know what you're talking

1  about when you say 47-8.  What are you talking about?

2          MR. BENNETT:  Judge, I'm reading from the

3  deposition that was attached to our opposition motion

4  for summary judgment.

5          THE COURT:  I've got the Monica Bey

6  deposition in front of me.

7          MR. BENNETT:  That's a different copy, Your

8  Honor.

9          THE COURT:  Okay.  Then tell me how to get to

10 what I've got in my copy.

11         MR. BENNETT:  To the plaintiff's

12 opposition --

13         THE COURT:  I've got this deposition, and

14 that's what I want to look in.  Now, can you tell me

15 what page I should go to?

16         MR. BENNETT:  I can't, Judge.

17         THE COURT:  Why not?

18         MR. BENNETT:  Because I have a different

19 pagination here.  We didn't have the copy that Your

20 Honor has at the time we filed the motion for summary

21 judgment.

22         THE COURT:  Who filed it?

23         MR. BENNETT:  The defendant filed that

24 motion.  I mean, that copy of the transcript.

25         THE COURT:  You know, there's a simple way of

1  coordinating these things, you know.

2            I don't have all the stuff I need.

3            (Mr. Bennett is handing some documents to the

4  Court.)

5            MR. BENNETT:  I have bracketed the relevant

6  section, including the "I don't recall" answer.  It

7  wasn't simply "I don't recall."  It was more than that

8  in the answer that precedes the bracket, that starts

9  the bracket.

10           MR. LYNCH:  Is it this page?

11           MR. BENNETT:  Yes.

12           THE COURT:  Okay.  So they stipulate they

13  don't have anything ever signed by any consumer related

14  to this account.  That's stipulated.  So why am I

15  dealing with this?  It's over.

16           Why can Monica Bey say something different

17  than that?  Okay.  I'll hear them on it later.

18           How can Monica Bey say something different,

19  Mr. Lynch?

20           MR. LYNCH:  Judge, that stipulation, which is

21  pretty clear that you do not have anything ever signed

22  by any consumer related to this account, that is true,

23  Judge, and at this time and it pertains to the Chase

24  application, which is also subject to her application.

25           At that time, Judge --

1          THE COURT:  It pertains to anything signed by

2   the consumer, and it's a stipulation that at that

3   time -- what date is this?

4          MR. LYNCH:  The date of the deposition is

5   March 19, 2009.

6          THE COURT:  March 19.  Okay.  As of March 19,

7   they didn't have it.

8          MR. LYNCH:  That's correct.

9          THE COURT:  When did discovery close?

10          MR. LYNCH:  Discovery closed, I believe, the

11   next day.

12          MR. BENNETT:  March 20.

13          MR. LYNCH:  March 20.

14          THE COURT:  Was it provided by March 20?

15          MR. LYNCH:  Judge, we provided that signed

16   Chase application early the next week.  That's when we

17   obtained it from Chase.

18          THE COURT:  But you didn't have it by the

19   close of discovery.  You didn't ask for an extension of

20   discovery.  And so now what part of Ms. --

21          MR. LYNCH:  The document that pertains to

22   that stipulation is the Chase application that we did

23   find later that's signed by Monica Bey.  And, Judge,

24   that's what I can tell the Court.  Otherwise, we didn't

25   have the document at the time.

1          THE COURT:  You didn't have it.

2          So they didn't have it.  Now, what is it

3   about Ms. Bay's declaration you want me to disregard?

4          MR. BENNETT:  Judge, we would accept, to

5   simplify it, her discussion in the declaration to the

6   extent that it authenticates these documents that

7   weren't produced, that the Court would strike her as an

8   authenticating witness and strike those documents which

9   were not produced.

10          THE COURT:  Would you like to tell me what

11   those are so I don't have to go back and --

12          MR. BENNETT:  In the original Monica Bey

13   declaration, which is attached as the exhibit to the

14   defendant's motion for summary judgment, at page -- I

15   mean --

16          THE COURT:  What do you want me to do?  Let's

17   get it straight.

18          MR. BENNETT:  Judge, all I want you to do is

19   to strike the purported application from Chase.  To

20   simplify it, that's all we need.  That document was not

21   produced in discovery.  There's no authenticating

22   witness for it.  So there's two independent bases to

23   strike the document.

24          THE COURT:  It's hearsay anyway.

25          MR. BENNETT:  And that's all.  The rest of

1 this discussion is, I believe, unnecessary.

2          THE COURT:  All right.  So the argument has

3 reduced itself to striking the Chase application

4 because they said they didn't have it.  They didn't

5 produce it to you in the discovery period.  They didn't

6 ask for an extension of time to do it, if they get it.

7 Obviously, if they found it the next week, they were

8 doing something about finding it.  They didn't ask for

9 any extension.  And in addition to that, the Chase

10 document is subject to an objection because it is

11 hearsay within hearsay.  Is that right?

12          MR. BENNETT:  That is, sir.  And the only

13 other --

14          THE COURT:  Let's hear from the defendant on

15 these points.

16          MR. LYNCH:  Judge, as I stated earlier, the

17 Chase application was not supplied until several days

18 after the discovery cutoff.  We did file a motion to

19 extend discovery that was denied by the Court.

20          THE COURT:  It was denied.

21          MR. LYNCH:  It was denied by this Court.

22          Judge, there was a miscommunication with

23 Chase, and that was the reason for the delay.

24          Just to put on the record, Judge, we believe

25 this is not hearsay.  It falls within the business

1  record exception.  We cited a case.

2          THE COURT:  I know, but it's hearsay within

3  hearsay is his next objection.

4          Let's assume for the moment that it qualifies

5  as somebody's 803(6) business record.

6          MR. LYNCH:  We've also identified in our

7  initial disclosures a representative of Chase, Judge.

8  We didn't give the name, but we did say a

9  representative of Chase would be available for trial.

10  They never moved to take the deposition of Chase at

11  all.

12          So we would have someone available at trial

13  to authenticate the record if the Court believes that

14  Palisades could not authenticate the application within

15  this case law.

16          THE COURT:  Who did you identify from Chase

17  in your disclosure?

18          MR. LYNCH:  It was not a specific name,

19  Judge.  It just said, "A representative of Chase."

20          THE COURT:  I don't think you can do that.  I

21  don't think that you can identify generally.  You have

22  to identify by name and address and so forth, don't

23  you?  What does the rule say?

24          MR. LYNCH:  I don't have it in front of me,

25  Judge, but I think you can identify -- you can say "a

1  corporate representative of the company," and then put

2  an address.

3          THE COURT:  It says, "The name and, if known,

4  the address and telephone number of each individual

5  likely to have discoverable information along with the

6  subjects of that information that the disclosing party

7  may use to support its claim to defenses unless the use

8  would be solely for impeachment."

9          MR. LYNCH:  Judge, going back, we believe

10  under the case law that we can get that Chase

11  application in through Palisades.  We have cited a case

12  that was just decided in February on this exact point

13  of allowing a successor bank to rely on a predecessor's

14  bank records and fall within the business records

15  exception.

16          THE COURT:  You're not a successor bank.

17          MR. LYNCH:  We're a successor signee of the

18  note.  We use the same analogy.

19          THE COURT:  That case that you're talking

20  about, didn't they succeed to the bank itself?  Which

21  case are you talking about?

22          MR. LYNCH:  I'm talking about the Centurion

23  Capital Corp, Judge.  It's a Northern District of

24  Illinois case.  Our position on that is that they have

25  allowed lenders and collection agencies to authenticate

1 debts based on records of predecessors and assigned

2 orders.

3        THE COURT:  Well, that case is basically at

4 odds with everything.  It's not a very well-reasoned

5 case, and it's at odds with previous decisions in this

6 court.  So I don't think it's persuasive and useful.

7        All right.

8        MR. LYNCH:  And then for the record we cited

9 the factors under the Southern States test that we

10 believe that -- she even mentioned during her

11 deposition that she anticipated that someone could have

12 signed her name on a credit application.  I don't know

13 the notion that Chase had a credit application could

14 come as any surprise to the plaintiffs at all.

15        We turned it over the day we got it.  We

16 don't think it would disrupt the trial at all.  Our

17 explanation, which I concede certainly isn't the best

18 one, that we had a miscommunication with Chase and had

19 to go back and follow up on it, but we feel that --

20        THE COURT:  When did the miscommunication

21 occur?

22        MR. LYNCH:  The miscommunication occurred --

23 it was an employee that made -- we thought had made the

24 request that had left the company, and then the request

25 had to be renewed.

1          THE COURT:  When did any of that occur?  None

2  of that is in the record.  And that could have occurred

3  at a time when you couldn't have reasonably expected to

4  get it or it could have occurred back when you could

5  have expected to get it.  It's not in the record that I

6  know of.  Is it?

7          MR. LYNCH:  No, it is not, Judge.  No, it is

8  not.  To tell the Court otherwise we just feel like

9  it's a document that could not come as a surprise at

10  all.  And, again, it wouldn't disrupt the trial.  We'd

11  make any accommodations necessary to opposing counsel

12  if they wanted to take any discovery on that

13  application.  It's, obviously, the heart and the core

14  of this -- one of the issues in the case.  We do

15  apologize to the Court that we didn't get it earlier.

16  And that's all I can say about it, Judge.

17          MR. BENNETT:  Judge, this Court actually

18  wrote the primary district court decision on Rule

19  37(c)(1).  So I'm not educating Your Honor, but it's

20  not enough that the defendant have substantial

21  justification.  That's one component of it.  And it is

22  the defendant's burden to show each of these elements

23  under 37(c)(1).

24          It is presumed excluded.  The document

25  itself, Judge.  The defendant presumes a lot in terms

1    of foundation.  There isn't any evidence as to how this

2    document arose.  There's no evidence as to -- even if

3    you look at the document, it doesn't -- it's not

4    self-evident as to where it came from.  It doesn't

5    mention Chase.  It doesn't have any explanation of the

6    recordkeeping procedure.

7              In addition, Judge, we asked the defendant's

8    30(b)(6) designee -- I asked a series of questions

9    about when they request documents from the purported

10   original creditor or assigner.  The witness couldn't

11   say what percentage of time.  Said that she couldn't

12   tell whether it's half or not half.

13             I asked, "Have you had the opportunity to

14   determine if there are any original documents?  That

15   is, an account record documents for the Azzi account,

16   credit card application or charge slips, anything with

17   signatures at all?"

18             The witness answers, "I don't recall."

19             I asked, "Who is the person who's been

20   assigned with the task of doing the research for this

21   particular account?"

22             Answer:  "Could you be more specific?"

23             "Right.  You were sued.  You know that one of

24   the documents that you were provided" -- well, my page

25   cuts -- or you have page 19.

1          THE COURT:  Here.  You can have it back.

2          MR. BENNETT:  Thank you, Judge.

3          We engage in the exchange in which Your Honor

4 has already read.  And then at the bottom I asked, "Has

5 anyone here" -- in asking about whether there was

6 research, I asked, "Has anyone to your knowledge

7 started this or done that?"

8          Answer:  "Not to my knowledge."

9          Question:  "How would someone go about doing

10 that?  Who is your contact at Chase?"

11          Answer on March 19:  "I don't know who our

12 contact is; however, we would certainly contact -- we

13 could certainly contact Chase if we were to do that."

14          "How would you find out who to contact at

15 Chase?"

16          Answer:  "The manager of the media department

17 would facilitate that contact."

18          This is March 19.  The representation to Your

19 Honor that it was engaged in this attempted research

20 project that it might have slipped through the cracks

21 by a former employee is inconsistent with their

22 management employee, the primary witness they offered,

23 who said clearly in her testimony that that process had

24 not begun, that she didn't know who to contact at

25 Chase.

1          There cannot be substantial justification,

2   Judge.  Certainly, the defendant concedes it would not

3   be harmless to us.  And the defendant hasn't

4   established the basis to suspend Rule 37(c)(1).

5          THE COURT:  All right.  Anything else?

6          MR. LYNCH:  Judge, just one thing for the

7   record.  What happened here is Mr. Bennett wanted to

8   take just a short deposition of Monica Bey on a limited

9   scope.  He goes past the limited scope and tries to

10  attribute those statements to Palisades.  That wasn't a

11  topic -- she wasn't prepared to talk about that issue.

12  And he was assuming the Court would allow discovery to

13  be extended so Monica Bey could testify the next week

14  on a long list of topics.

15         What's happening here is that wasn't

16  something that she was prepared to talk about.  And I

17  admit to this court that we don't have evidence in the

18  record about the exact steps we took to get the Chase

19  application.  All I can represent to the Court is what

20  I've already represented.

21         We're still a month before trial.  They have

22  had the application since March 20 or 22 or right after

23  that.

24         THE COURT:  The discovery cutoff was when?

25         MR. LYNCH:  March 20, Judge.  And I think we

1  provided the application either the 23rd or 24th.  It

2  was early the next week.  But the notion that, you

3  know, Monica Bey speaks for Palisades on these issues

4  is not the case.  It's very clear in the beginning of

5  the deposition what the scope of that deposition was.

6         THE COURT:  All right.  Is this a 30(b)(6)

7  deposition?

8         MR. BENNETT:  Yes, sir.  In fact, exactly the

9  opposite of what Mr. Lynch just said.  The limitation

10  under Rule 30(b)(6), and it's in the deposition, which

11  I will now read.  The very start of the deposition, the

12  first word is that it is limited and focused on this

13  exact issue, the documents that are kept and how they

14  are maintained.

15         THE COURT:  Can you read what the designation

16  was or scope is?

17         MR. BENNETT:  Yes, sir.  Mr. Bennett at the

18  beginning of the deposition on the record, "This is an

19  unusual posture.  This deposition is taken by

20  stipulation and agreement of the parties.  First, it is

21  being taken on a narrow range or sort of a subset of a

22  30(b)(6) deposition.  I am off the clock in one hour

23  and one half or less without qualification.  The

24  purpose, counsel, as I understand it, is to inquire

25  into the manner in which documents, records, are

1 maintained related to the Fair Credit Reporting Act by

2 the defendant.  And certainly as to what documents of

3 that subcategory of documents may exist.  And that is

4 the only purpose for this sort of abbreviated

5 deposition.  Right?"

6           "MR. ROSSMAN:  Yes, that's what you

7 requested.  That's what you agreed to.  Not a problem."

8           So, Judge, it was a 30(b)(6), and the

9 questions that we're discussing right now, the

10 documents and the existence of these documents, was the

11 focus of the 30(b)(6).

12           So those arguments might matter if we were

13 asking about how much is an employee paid, for example,

14 but not for the issues that are now raised before the

15 Court.

16           Judge, I had assumed in this process at this

17 hearing that you were going to our objection target by

18 target.  The Neal declaration, the Bey declaration

19 parts, and the application.  We have not yet addressed

20 the purported account statements either, but that was

21 also a subject to our hearsay objections under the Rule

22 56(e) objection.

23           THE COURT:  Is that a Chase document?

24           MR. BENNETT:  It's purported to be a Chase

25 document.  It will be authenticated by Mr. Neal.

1        THE COURT:  That affidavit is gone.

2        MR. BENNETT:  Yes, sir.

3        THE COURT:  It's out of play.

4        MR. BENNETT:  Yes, sir.

5        THE COURT:  All right.  Well, now we're

6  talking about just the application, right?

7        MR. LYNCH:  Yes, Judge.  And Mr. Bennett is

8  right.  It was a 30(b)(6).  They wanted to only take it

9  for an hour and a half.  He read exactly what the

10 stipulation was, but that stipulation doesn't talk

11 about trying to get documents from Chase and

12 predecessor lending institutions.  It talks about the

13 documents that Palisades maintains relating to the Fair

14 Credit Reporting Act.

15        And looking at the deposition, Judge, it's

16 obvious he did ask about those issues, about documents

17 that Palisades does maintain relating to the Fair

18 Credit Reporting Act.  This issue on the Chase

19 application he asked about.  She said she did not have

20 any documents at that time signed by the consumer.

21        Again, she wasn't prepared to talk about

22 policies and procedures of obtaining original documents

23 from predecessor banks.

24        THE COURT:  The application, there was a

25 stipulation that a day before the discovery was over

1   they didn't have any application.  And it wasn't among

2   any documents disclosed.  Probably the key document in

3   any case in which the dispute is whether the account

4   belonged to the plaintiff or not.  And it wasn't

5   disclosed because they didn't have it.

6           When Palisades went to look for it is not

7   shown in the record.  What is shown in the record is as

8   of March 19 they didn't have it in their records, and

9   they didn't get it until after the close of discovery.

10          The analysis under Rule 37(c) begins with

11  whether or not the party was surprised by the evidence.

12  I think it goes without saying from this record that

13  when somebody says they don't have something and

14  there's no indication they are going to get it, that

15  when you get that very thing that they denied and

16  stipulate not having, that you're surprised.

17          The question then comes is how can the

18  consequence of the surprise be cured?  It can only be

19  cured by reopening discovery and allowing new

20  depositions in order to explore all the providence of

21  the document, the meaning of the document.  There's no

22  other way to cure this surprise, and, basically, it

23  means reopening the case.

24          The third factor is the extent of disruption.

25  We have a trial scheduled on what?  What's the date of

1   the trial?

2          MR. LYNCH:   June 11.

3          THE COURT:   June 11.  So we'd have to be

4   reopening all discovery.  Right now what should be

5   going on under the pretrial order is the preparation

6   for the trial and all of the things that are to be done

7   to get ready for the trial.  All of that would be

8   changed and have to be redone and reordered in

9   perspective of the new discovery that would be taken in

10  respect of this document and the information about it.

11          And there's the importance of the document.

12  Of course, it's important to Chase.  But knowing what

13  kind of document they needed is one of the first things

14  they should have gone about asking about of the entity

15  from whom they acquired the account.  It was important

16  to the plaintiff to have that information, too, in

17  order to shape its discovery.

18          So it's important to both sides.  The fact

19  that it's important dictates that it's too late to have

20  it put into the case because the whole structure of the

21  case would change.

22          In addition to that, the Chase document

23  application is hearsay within hearsay.  The decision in

24  Rambus v. Infineon Technologies, 348 F.Supp2d, deals

25  with this at 706.  The decision begins at 698.  And at

1 707 under the principles therein cited, it seems to me

2 that it's quite clear hearsay within hearsay.  So the

3 objection to the application is sustained.

4         Now, is there some other objection that you

5 were mentioning, Mr. Bennett?

6         MR. BENNETT:  Yes, sir, Judge.

7         The purported account statements the

8 defendants offers --

9         THE COURT:  What are the account statements?

10         MR. BENNETT:  These are -- well, they are

11 documents.

12         THE COURT:  Are they in your motion?

13         MR. BENNETT:  They are, Your Honor.

14         THE COURT:  Mr. Lynch looks perplexed.

15         MR. LYNCH:  Yes.  I was prepared for

16 everything else.  Not this, Judge.

17         THE COURT:  Well, if it's not in the motion,

18 how can we deal with it?

19         MR. BENNETT:  It's in the motion, Judge.

20         THE COURT:  Where in your papers is it?

21         MR. BENNETT:  Judge, the original objection,

22 page 4.  Certainly to the extent that the Neal and Bey

23 declarations cannot be used to authenticate the

24 disputed credit application or account statements, they

25 are inadmissible as lacking any foundation and as

1 hearsay.

2          THE COURT:  Wait a minute.  Page 4?

3          MR. BENNETT:  Yes, sir.

4          THE COURT:  Credit application or account

5 statements?

6          MR. BENNETT:  Yes, sir.  And then page 11 of

7 our reply.

8          THE COURT:  All right.  Well, they are raised

9 there, Mr. Lynch.  You know what he's talking about

10 now?

11          MR. LYNCH:  I don't.  I'd have to see the

12 exact document that he's talking about.  The

13 application was produced -- my understanding is

14 whatever statements he's talking about were produced

15 timely.

16          THE COURT:  Show it to him, Mr. Bennett.

17 Show him the account statements that you're talking

18 about.

19          MR. BENNETT:  It's Exhibit F to the original

20 Bey declaration.

21          THE COURT:  The Bey declaration was submitted

22 by them?

23          MR. BENNETT:  Yes, sir.  It's also Exhibit C

24 to the Neal declaration.  And they are referred to as

25 account statements by the defendant.  Exhibit C to the

1  Neal declaration is what I'm looking at now.

2         THE COURT:  Show it to him.

3         MR. BENNETT:  The defendant discusses it in

4  its response brief.  They defend the account statements

5  in the response brief, Judge.

6         MR. LYNCH:  Judge, I understand now.

7         THE COURT:  All right.  Tell me what the

8  account statements are now again and for the record so

9  we understand what we're dealing with.

10        MR. BENNETT:  Yes, sir, Judge.  The documents

11 attached to the now excluded Neal declaration as

12 Exhibit C to that declaration.  They are also attached

13 as Exhibit F to the original Bey declaration.  The Bey

14 declaration that was offered in support of the

15 defendant's original motion for summary judgment.

16        I call them account statements because that

17 is how they have been referred to by the defendant.

18 But at the bottom of Exhibit C it says, "This statement

19 is a facsimile not an original."  So we're not entirely

20 sure.  They say Bank One on them, not Chase.  And to

21 the extent that these documents purport -- that the

22 defendant tries to use these documents to prove the

23 truth of what is asserted in them, that is the use of a

24 credit card that has as one of two listed parties my

25 client and her ex-husband, to use them for the truth of

1 the matter asserted would be hearsay.  It would also be

2 a foundation objection because there's no testimony as

3 to where these came from.

4         Even if they can be authenticated as former

5 Chase documents, there isn't any evidence as to what

6 they mean to Chase.  That is, does Chase construct

7 these out of its accounting database?  Are they created

8 after the fact once Mr. King filed bankruptcy?  Was my

9 client added in any of those foundation questions in

10 addition to the simple hearsay question are unanswered

11 and unaddressed.

12         The defendant's response in its brief is that

13 our client knew about these statements because when

14 they took her deposition, they asked her generally

15 about statements.  They didn't ask about these

16 particular documents.  And she had seen statements on

17 this account that Palisades was asserting.

18         She didn't testify that she received them in

19 the mail on a monthly basis and that she saw them

20 coming in or otherwise.  There's no such testimony.

21         THE COURT:  Can you give me one of your

22 copies of the statement so I will have them while

23 you're talking?

24         MR. BENNETT:  Yes, sir.  Here is Exhibit C

25 from the now excluded Neal declaration.

1          And, Judge, we object on hearsay and

2  foundation.  I don't believe it's complicated.  And to

3  the extent that the defendant offers them for the truth

4  of the matter asserted, an indebtedness by our client,

5  their objection.

6          The defendant does not offer them for any

7  other reason.  That is, the defendant does not offer

8  them to say, Well, look, when we were doing the

9  investigation, we looked at these account statements

10 and maybe we made a mistake, but we had these in front

11 of us.  And if they're wrong, they're wrong, but we

12 didn't know they were wrong.

13          That's not the argument.  The defendant never

14 looked at these document.  There's no evidence they

15 ever even had them until the litigation.  And still

16 there's no evidence as to where they came from other

17 than a generic reference in the now excluded Neal

18 declaration where he says "Attached are the documents

19 we have from Chase."

20          THE COURT:  All right.

21          MR. BENNETT:  Judge, I'm sorry.  I also have

22 cited separately Your Honor's ruling on exactly this

23 question in the Mullins matter, and I've attached and

24 produced to the defendant as well the transcript from

25 the pretrial hearing in which these issues were

1 addressed as to attempts to use MBNA account

2 statements.  We asked Your Honor to rule consistent

3 with the ruling in that decision.

4       MR. LYNCH:  Judge, I am familiar with these

5 documents.

6       My understanding is this is different than

7 the Chase account.  These documents were produced

8 during discovery.  They are part of the business

9 records from Palisades.

10       MR. BENNETT:  They were produced, Judge.

11       MR. LYNCH:  They were produced before the

12 discovery.  They are part of the business records.

13 They are not part of the documents we obtained from --

14 the application that we obtained late.  These were in

15 Palisades' records.  These are business records when

16 they obtained the account from Bank One.  This is a

17 clear business record.

18       Mr. Bennett is right.  There's no evidence

19 that these account statements were looked at, but the

20 issue is on the accuracy she's testified that she

21 received these statements, and we're entitled to

22 cross-examine her and say, "Have you ever seen these

23 statements?  Did they come to your house?  Do you ever

24 remember seeing them?"  And that's the relevance.  It

25 goes to the accuracy prong, not the reasonable inquiry

1  or investigation prong.

2          Again, Judge, they were produced during

3  discovery as a part of our business records.  They come

4  in through Monica Bey on a business record exception.

5          THE COURT:  He says there's no foundation for

6  them that they are business records or what they are or

7  whose they are or anything else.

8          MR. LYNCH:  First of all, they are our

9  business records.  Monica Bey has authenticated them.

10 He's saying there's no -- I don't know what the basis

11 is.  They are just like any other business record that

12 Palisades maintains.

13         People have business records all the time

14 that are records that they received from other

15 companies.

16         THE COURT:  What does Monica Bey say about

17 them?

18         MR. LYNCH:  We can go to her declaration.

19         THE COURT:  Yes, I said, "What did she say

20 about them?"

21         MR. BENNETT:  Here's the Neal declaration to

22 which those are attached as well.  And I believe

23 paragraph -- that exhibit, Exhibit C, is discussed in

24 paragraph 4 in the statement of custody in paragraph 1.

25         THE COURT:  Well, the Neal affidavit is

1  withdrawn.  I'm not considering that.  I just was

2  looking at the documents.

3           MR. LYNCH:  I'm looking at the Monica Bey

4  deposition.

5           THE COURT:  What does she say about Exhibit F

6  to her declaration?

7           MR. LYNCH:  I believe it's Exhibit E, Judge.

8  Is it F?  Yes, it is F.

9           THE COURT:  Is this her affidavit?

10          MR. LYNCH:  Yes, Judge.

11          THE COURT:  What does she say about these

12  documents?

13          MR. LYNCH:  Judge, I believe there's a typo.

14  It's referred to as Exhibit E, but it should be Exhibit

15  F.  It says, Attached as Exhibit E is a true copy of

16  the application and statements on the account received

17  by Palisades from Chase.  Personal information has been

18  redacted.

19          It's also, Judge, referenced in paragraph 4.

20  It says, Exhibit E is documents we received from Chase

21  regarding the account as maintained on our computer

22  system.  I've reviewed all of these documents and

23  attest they are true and accurate copies of the records

24  maintained by Palisades except the personal identifiers

25  have been redacted.  And that such records are made and

1  kept in the ordinary course of business with entries

2  made contemporaneously with the transaction of business

3  at Palisades.

4        Judge, what happened here is those Bank One

5  statements were transferred at the time when the

6  account was transferred to Palisades, and they were

7  maintained by Palisades in their records on this

8  account.  The application was not.

9        THE COURT:  Well, what she just says, all she

10  says is that we got these things from Chase.  They have

11  got a Bank One statement on them.  How they went from

12  Bank One to Chase is not established.  Then she said

13  Palisades got them from Chase.  Then there's no way

14  that the last paragraph that you just read can be true.

15  Read the last sentence of her declaration that you just

16  read to me again.

17        MR. LYNCH:  "I have reviewed all of these

18  documents and attest that they are true and correct

19  copies of the records maintained by Palisades."

20        THE COURT:  That's not it.  The next one.

21        MR. LYNCH:  "And that such records are made

22  and kept in the ordinary course of business with

23  entries made contemporaneous with the transaction of

24  business at Palisades."

25        THE COURT:  That can't be true because they

1  belonged to somebody else.  The only part of that

2  that's true is that they kept them.  That's the only

3  part of what she just said in that sentence can be true

4  because these were not made by these people.  They were

5  not contemporaneously annotated, and so all that

6  establishes, Mr. Lynch, is that these are documents

7  that they got from Chase and that they brought them

8  into their system and they keep them that way.

9          Is that a business record?

10         MR. LYNCH:  We take the position in the case

11 law that it is a business record.

12         THE COURT:  Okay.

13         MR. LYNCH:  I want to make sure the Court

14 doesn't think this statement was inclusive of other

15 exhibits in the same paragraph, too.  I don't want you

16 to think that statement was just applying to Exhibit E.

17 In that same paragraph in the declaration there's other

18 exhibits.  So I don't want the Court to think we were

19 playing fast and loose with the declaration of Monica

20 Bey.

21         THE COURT:  I never think you're playing fast

22 and loose.  I think the affiant didn't know what she

23 was talking about.  All right.  Thank you.

24         The account statements lack foundation and

25 haven't been qualified as business records.  I'll not

1   consider them as part of the summary judgment issue.

2         The deposition of Sharon McCauley and

3   Michelle Samuels.  What is that all about?  You-all

4   filed some papers today.  What part of the testimony of

5   these people, McCauley and Samuels, is going to be

6   offered?

7         MR. LYNCH:  These two employees, Judge, are

8   going to be testifying on damages that Monica Bey did

9   not receive a mortgage from Weststar because of this

10  alleged inaccuracy on a credit report from Palisades.

11        The basis of our objection, and we've cited

12  some cases from other jurisdictions on this exact

13  issue, is these are just employees that are actually

14  working at franchises of Weststar.  They were not

15  involved in the underwriting or making the decision

16  about why the mortgage was denied.

17        THE COURT:  But the ladies' testimony said

18  they did work at Weststar.

19        MR. LYNCH:  Correct, Judge, they worked for

20  Weststar.  The way Weststar is set up is it's

21  franchisees and franchisors, but they testified in

22  their connection and employment at Weststar they were

23  not involved in the underwriting or the decision.  They

24  had no firsthand knowledge about why the mortgage was

25  denied.

 1          You cannot go to a company and just take

 2  depositions of random employees and ask them if they

 3  don't have firsthand knowledge.  They either have to

 4  have firsthand knowledge of the denial or you have to

 5  take a corporation deposition.

 6          THE COURT:  I'm not quite sure what a random

 7  employee is, but these people handled her loan, I

 8  thought.

 9          MR. LYNCH:  They were, and they could not

10  testify on the reason -- they were not qualified,

11  Judge.  They didn't participate in the reason for the

12  denial.  They don't know why.  They are not qualified

13  to say why the loan was denied.  They don't have

14  firsthand knowledge.  That's hearsay.

15          THE COURT:  All right.

16          MR. LYNCH:  And we have cited cases saying

17  that type of hearsay knowledge from people who work at

18  mortgage companies isn't sufficient to support that

19  damage claim.

20          THE COURT:  Okay.  What are they going to

21  testify to, Mr. Bennett?

22          MR. BENNETT:  Well, Judge, two issues.  The

23  first is what's on summary judgment and what's at

24  trial.  On summary judgment, Judge, they have testified

25  that my client went in.  Applied for a loan.  This

1 blemish existed on her credit report and that she

2 didn't get the loan.  That's all we would need to

3 testify to allow a circumstantial conclusion that this

4 was a factor in the loan.

5          And, in fact, we've cited, this isn't my

6 supposition, we've cited a string of cases, which is --

7          THE COURT:  You're not offering the testimony

8 that somebody told them this is the reason?

9          MR. BENNETT:  No, sir, we're not offering

10 that at all.

11          In addition, there isn't a case before Your

12 Honor, and, of course, Your Honor is not -- if the

13 decision is wrong -- Your Honor consistently rules

14 right, regardless of the series of decisions, so I

15 don't want to make the fallacy by generalization or by

16 (unintelligible) --

17          THE COURT:  Whoa, whoa, whoa.  I want you to

18 order this part of the transcript, and I want you to

19 read it, and I want you to tell me what on earth I

20 would interrupt from what you just said.  Now, slow

21 down.  Don't put in the disconnects.  Just make the

22 points you're talking about.  I can't follow it.

23          MR. BENNETT:  Actually, the argument of

24 fallacy, not necessarily great for lawyers, is the

25 fallacy of saying you should rule a certain way because

1  some other authority, not a Fourth Circuit or Supreme

2  Court authority, tells you to do so even when it would

3  be inconsistent with Your Honor's own judgment.

4        I'm qualifying what I'm about to say, which

5  is this would be the first time that Your Honor -- if

6  Your Honor rules that the loan officer who works for a

7  mortgage lender could not provide testimony that

8  explain why her mortgage company denied the loan, this

9  would be the first decision that so rules, including

10  the two cases that the defendant cites.

11        And I qualify the first decision of which I'm

12  aware is as comprehensive a search as could be done,

13  which is significant given this is my bailiwick, this

14  area of law.

15        Even the cases the defendant cites, in one

16  instance, find that a witness who worked for mortgage

17  company A, a third-party broker actually, could not

18  offer testimony, lay testimony, about what other

19  mortgage companies would likely have done.  But that's

20  not admissible.  And then concludes at the end of --

21        THE COURT:  But you're not offering their

22  testimony to that end, are you?

23        MR. BENNETT:  No, sir, we're not offering it

24  to that.  And at the end of that very case, their

25  decision says it would be admissible if it was

1    testimony from a lender employee itself.

2          In addition, the second decision that the

3    defendant offers, similarly consistent with all that we

4    have just held or explained, actually was a plaintiff

5    who was himself a mortgage broker and who wanted to

6    testify that he knows why he couldn't get a loan

7    anywhere because these other mortgage companies would

8    have denied him because of this.

9          Contrast that with the decisions that we've

10   offered in which court after court has held that we

11   meet the proof burden of a substantial factor with the

12   testimony of the loan officer or an employee of the

13   lender who says the application was submitted.  The

14   credit report was used.  This blemish was on there and

15   you didn't get the loan.

16         THE COURT:  That's all you're offering it for

17   is for summary judgment?

18         MR. BENNETT:  For summary judgment is all

19   we're offering it for, Judge.  It wasn't clear in their

20   original brief what specific testimony they were

21   offering.  They were asking for the total exclusion of

22   these witnesses including -- but these two employees

23   were the actual employees that were in charge of and

24   handled the loan involving the plaintiff.

25         THE COURT:  All right.

1          Are you trying to exclude anything else from

2   their deposition other than this, what he's going to

3   offer it for?

4          MR. LYNCH:  What we're actually seeking is to

5   exclude this from the damages portion of the case,

6   Judge.

7          THE COURT:  Because you don't care about it

8   for summary judgment?

9          MR. LYNCH:  Well, we're seeking summary

10  judgment on damages.  So we are seeking to exclude it.

11         THE COURT:  That's what I thought.

12         Can I consider their deposition testimony to

13  the extent he related that he's offering it, which is

14  they were the loan officers, they processed it, it had

15  this on there, they were denied?  Can I consider it for

16  those purposes?

17         MR. LYNCH:  You can consider it for those

18  purposes, Judge, but we believe what they have to prove

19  on summary judgment is this inaccuracy on the

20  Palisades' account was the substantial reason for the

21  denial, and these witnesses are not qualified to

22  testify to that.  That's our point.

23         THE COURT:  Okay.  Thank you.

24         I think that that's a substantially more

25  reduced motion than the scope of the motion originally,

1 and the motion is denied.  Those witnesses can testify,

2 and it can be considered, that testimony can be

3 considered to the extent that the plaintiff has

4 indicated that that testimony is being offered in

5 connection with the summary judgment on the damages

6 part of the case.

7             All right.  Now, that takes care of all the

8 motions, doesn't it, on the evidence?

9             MR. BENNETT:  Yes, Your Honor.

10            THE COURT:  Summary judgment.  Plaintiffs

11 first.

12            MR. BENNETT:  Your Honor, plaintiff has moved

13 for summary judgment on the issue of accuracy.  We ask

14 the Court to rule as the court did in Alabran v.

15 Capital One, a decision that Your Honor actually cited

16 in multiple places.  It is the elongated disposition of

17 the Mullins case.

18            In this instance, Judge, there is no evidence

19 that our client is obligated.  She has testified

20 consistently that she was not under oath, in her

21 deposition under oath, and her declaration.

22            THE COURT:  What?  She was not under oath at

23 her deposition?

24            MR. BENNETT:  No.  She testified consistently

25 in her declaration at her deposition that she was not

1  obligated.   That she never applied for, used,

2  authorized this account.   She learned of this account

3  when it became an obstacle on her credit report when

4  she obtained her credit report.

5            You also have the testimony of the

6  ex-husband.   The defendant solicited a declaration.

7  And in that declaration it included a paragraph or

8  three relevant paragraphs.   The first two said, "I did

9  not personally sign the signature."   But paragraph 5 of

10  the declaration, the witness wrote on the declaration,

11  of course signing it under oath, that he could not

12  truthfully testify that 5 was accurate.   And 5 stated

13  that he could not testify that he had not used the

14  account without our client -- or not obtained the

15  account without our client's authority.   I will have to

16  actually look at the declaration.

17            THE COURT:   Do you think maybe I could see

18  that?

19            MR. BENNETT:   Yes, sir.

20            THE COURT:   Just to follow what you're

21  saying.

22            MR. BENNETT:   The defendant first offered the

23  King declaration, and this is what the King declaration

24  the defendant offered said.

25            (Mr. Bennett is handing documents to the

1  Judge.)

2          THE COURT:  There is no 5.  He struck it out.

3          MR. BENNETT:  There's no 5.  Mr. Lynch

4  himself contacted us and stipulated --

5          THE COURT:  Mr. Lynch or Mr. King?

6          MR. BENNETT:  Mr. Lynch.

7          As soon as we received that service of that,

8  we contacted the defendant and said, "Where is the

9  original declaration?"

10          Mr. Lynch then responded, and it's attached

11  now as Defendant's Exhibit 3418, but the language that

12  Mr. Lynch represented was, quote, I did not incur

13  charges on the Bank One account without the plaintiff's

14  authorization.  I did not incur charges on the Bank One

15  account without the plaintiff's authorization.

16          You also have attached as --

17          THE COURT:  So that's what he struck through

18  and said "I didn't agree with"?

19          MR. BENNETT:  That's true, yes, sir.

20          THE COURT:  He said, "Do not agree with

21  No. 5"?

22          MR. BENNETT:  Yes, sir.

23          THE COURT:  And what you just read was No. 5?

24          MR. BENNETT:  That was No. 5.

25          In addition, the third party witness,

1  Mr. King, testified under oath in his bankruptcy

2  petition, which we cite -- we attach again in support

3  of our motion in opposition to the defendant's, and he

4  testified, Mr. King did, under oath in filing his

5  bankruptcy petition, Exhibit 2 to our opposition to the

6  defendant's motion for summary judgment, produced by

7  the defendant, Bates No. 392 and 393, that this was an

8  individual account belonging to Mr. King and not an

9  obligation of the wife.

10          THE COURT:  Who testified to that?

11          MR. BENNETT:  Mr. King.  Swore under oath in

12  his petition for bankruptcy.

13          Formal pleading filed in court under oath

14  under Schedule F, creditors holding unsecured

15  non-priority claims.

16          This account was identified as belonging to

17  H, husband and wife, joint, or community, as H.  As his

18  obligation, husband's obligation.

19          And then as well in a list in a further

20  schedule of any codebtor accounts.  There aren't any.

21  He leaves it totally blank.

22          Schedule H, which is Bates No. 399 of this

23  Exhibit 2, Schedule H, codebtors.  Name of codebtor,

24  blank.  Number and address of creditor, blank.

25          There is no other evidence that our client

1   was obligated on this account.

2           In contrast --

3           THE COURT:  According to this affidavit, it

4   says, "I did not sign the plaintiff's name on the

5   application attached as Exhibit A, and I did not

6   forge," this is paragraph 4, "I did not forge the

7   plaintiff's signature on the application attached as

8   Exhibit A."

9           But the application attached as Exhibit A is

10  something I have said I'm not considering right now.

11          MR. BENNETT:  Yes, sir.

12          THE COURT:  So what does this affidavit have

13  to do with anything?

14          MR. BENNETT:  It doesn't have anything to do

15  with anything.

16          THE COURT:  Why are you talking about that?

17          MR. BENNETT:  It's the defendant's only

18  argument in opposition to our summary judgment.

19          THE COURT:  Why isn't the best argument that

20  their argument doesn't fly because there's nothing for

21  paragraphs 3 and 4 to relate to?

22          MR. BENNETT:  That is the best argument,

23  Judge.  Maybe I was building to our claim.

24          THE COURT:  All right.  But on your argument,

25  do you have affirmative proof that this was a sworn

1 bankruptcy filing and that he said it was his account?

2          MR. BENNETT:  Yes, sir, we do.

3          THE COURT:  Okay.  Did you depose him?

4          MR. BENNETT:  We did not depose him.

5          THE COURT:  Did they depose him?

6          MR. BENNETT:  They didn't depose him.

7          THE COURT:  So how are you getting that in?

8          MR. BENNETT:  Well, the verification, it's a

9 court document, and the defendant produced it, and if I

10 declare --

11          THE COURT:  How are you getting it into

12 evidence?

13          MR. BENNETT:  The bankruptcy?

14          THE COURT:  Yes.

15          MR. BENNETT:  We're offering it as a court

16 document.  It's not been objected to as hearsay.  If we

17 needed to, we could support it, but the defendant has

18 produced the document to us.

19          THE COURT:  And they haven't objected to

20 considering it?

21          MR. BENNETT:  They have not objected to

22 considering it.  They have not made a hearsay

23 objection.  We can argue the public records rule, but

24 we don't need to.  There's no objection as to hearsay.

25          In contrast, again, you have the plaintiff's

1   sworn testimony in her deposition, the plaintiff's

2   sworn testimony in her declaration.  You also have the

3   sworn testimony of the mortgage employees who testified

4   that the plaintiff was upset and disputed to them this

5   was not her account, to which again no hearsay

6   objection has been made, but it was their deposition

7   testimony.

8           The only other evidence that the defendant

9   suggests is that there was a mortgage application that

10  was submitted to Weststar, and in that mortgage

11  application the loan officer testified it's auto

12  populated from a credit report.  It included this

13  account as a debt that would have to be included in her

14  mortgage application.  And she signed it.  And the

15  defendant said that's evidence that she owes the debt.

16          You have the testimony of the witness, of the

17  mortgage officer, was that it was explained to her, to

18  the mortgage broker, and my client in all their

19  discussions in circulation of that application that it

20  was not hers, and it was not a correct account, but it

21  had to be included by the mortgage company because it

22  was on her credit report, which is the issue in this

23  case itself in part.  The damages.

24          THE COURT:  Which anyone who has applied for

25  a mortgage knows is correct that they put those things

1  on there, and they tell you to sign them, even though

2  you tell them they are not right.

3          MR. BENNETT:  Yes, sir.

4          THE COURT:  And they won't let you proceed

5  unless you do it their way.

6          MR. BENNETT:  That's correct.  And you have

7  deposition testimony from the loan officer that

8  confirms that.

9          But other than that, there isn't any evidence

10  that this was not her account.  I don't know if the

11  defendant really believes it was her account, but there

12  is certainly no evidence that it was.

13          MR. LYNCH:  Judge, we adamantly believe this

14  is her account.

15          THE COURT:  I appreciate that you do, and I

16  will tell you that beliefs are not the basis upon which

17  summary judgment is granted or denied.

18          MR. LYNCH:  I understand, Judge.

19          THE COURT:  Let's go ahead.

20          MR. LYNCH:  The first and main piece of

21  evidence that clearly creates a fact issue here, Judge,

22  is that uniform residential loan application signed

23  under penalty of perjury when she applied for the loan

24  after the bankruptcy of her husband saying this was her

25  debt.  She could have marked that out.  She could have

1  got it corrected.

2          THE COURT:  They won't let you mark it out.

3  They won't let you do it.  If it's on the credit

4  report, they stick it down your throat.  Isn't that

5  what happens?

6          MR. LYNCH:  That's not been -- I've had --

7          THE COURT:  That's not a record in this case.

8          MR. LYNCH:  That's not a record in this case,

9  Judge.  The record in this case is a document she

10  signed under oath saying it is her debt.

11          THE COURT:  That's enough to create a factual

12  dispute?

13          MR. LYNCH:  That is no question enough to

14  create a factual issue.

15          THE COURT:  Anything else that creates a

16  factual issue or are you content to rely on that one?

17          MR. LYNCH:  We have cited some others.  We,

18  obviously, wanted the application to be considered.

19  The Court has struck that.

20          THE COURT:  Well, we're not going to consider

21  that.  So let's go on.

22          MR. LYNCH:  She also testified in her

23  deposition that she received account statements on this

24  account, that no question that that is some evidence

25  that can be considered by the trier of fact.

1          THE COURT:  Why is that evidence that it was

2  her account?  Don't you get things in the mail all the

3  time that don't belong to you?

4          MR. LYNCH:  I also get things in the mail

5  that do belong to me.  But you're right, Judge,

6  sometimes you get mail from other people.  I'm not

7  saying that, but I certainly think that that's a fact

8  in addition to this uniform residential application

9  signed under oath.

10          THE COURT:  All right.

11          MR. LYNCH:  Also, Judge, she has another

12  account, a Citi account, that she said was a fraud or a

13  forgery, and the trade line was deleted by Palisades,

14  and she had that card at her deposition on her person.

15          THE COURT:  She had what card?

16          MR. LYNCH:  She had another Citi credit card

17  that she said was not hers at all.  She had it at the

18  deposition.  The trade line was deleted by Palisades.

19          THE COURT:  What does having it at the

20  deposition have to do with anything?  What does having

21  it at the deposition have to do with anything?  That

22  may mean something to you.  It doesn't mean anything to

23  me.

24          MR. LYNCH:  We believe it's a credibility

25  fight for her when she says things are fraud and

1 forgery and she still has the account.

2          THE COURT:  Well, that's different than what

3 you just said.  You said she had the card.  For all I

4 know she was offering the card as proof of something at

5 the deposition.  I didn't understand.

6          You're telling me now that she had an account

7 with another bank?

8          MR. LYNCH:  Correct.

9          THE COURT:  And you have evidence of this?

10         MR. LYNCH:  Correct.

11         THE COURT:  That she claimed as fraud and

12 your client deleted it?

13         MR. LYNCH:  Correct, Judge.

14         THE COURT:  And then she later is using that

15 account?

16         MR. LYNCH:  She had it on her person.  She

17 had it.  She actually had the card at her deposition.

18         THE COURT:  How did you find that out?

19         MR. LYNCH:  It was asked of her during the

20 deposition.  I didn't take the deposition.

21         THE COURT:  Someone asked her if she had the

22 credit card with her?

23         MR. LYNCH:  That's my understanding, Judge.

24 I wasn't at the deposition, but that's how the record

25 shows.

1          THE COURT:  Now I understand what you're

2  saying.  Now, what is the probative value of that?

3  That she just claims everything is not hers?

4          MR. LYNCH:  Correct.

5          THE COURT:  Still has it and uses it?

6          MR. LYNCH:  Correct, Judge.  Correct, Judge.

7          THE COURT:  She is a fraud in your view and

8  it's a credibility question?

9          MR. LYNCH:  No question, Judge.  And when you

10 take that in conjunction with her husband testifying

11 that he didn't sign the application, even though the

12 application didn't come in, he can testify he never

13 signed an application on her behalf.  He can say that.

14 That is not hearsay.  It doesn't require the

15 application to come into evidence.  He can testify to

16 that fact.

17          And in conjunction with this signed uniform

18 residential application under oath, we think that is

19 more than sufficient to create a genuine issue of

20 material fact, and the Court needs to hear the people

21 testify about whether this is her account or not.

22          THE COURT:  All right.  I think I understand.

23          MR. BENNETT:  Judge, the defendant makes two

24 arguments.  The first, again, is the application.  And

25 the defendant's counsel says there's nothing in the

1 record to support Your Honor's supposition.  That's not

2 correct.

3            We attached the declaration, and we cited to

4 page and line number of the McCauley deposition, the

5 loan officer, at page 64 of her deposition.  The

6 question, at line 19, "Where did the information on

7 page 3 of the uniform residential loan application come

8 from?"

9            Answer of the loan officer:  "From her credit

10 report."

11            Question:  "And she signed, she initialed the

12 bottom of that, correct?"

13            Answer:  "Yes, sir."

14            Question:  "So would you read this document

15 to mean that she owes the debts that are listed on

16 there?"

17            Answer says:  "Yes.  Well, it's not that she

18 owes, no, no, no, no.  This is just the credit report.

19 Just transferring her liabilities to the application.

20 By her signing that, that doesn't mean that she's

21 saying I owe that money.  Do you see what I mean?  It's

22 just a loan application.  If you want to call it that

23 way, you may be right.  I don't know."

24            Question:  "Fair enough."

25            Line 23 of page 65, "Who fills out that

1   document?"

2          Answer:  "I do."

3          Question:  "So you take the information from

4   the credit bureau and you put it on that form?"

5          Answer:  "It goes automatically."

6          That's the record.  Your Honor's supposition

7   is correct.

8          THE COURT:  I wasn't supposing.  I was

9   believing that's what you were saying in your papers.

10         MR. BENNETT:  Your Honor, correct.

11         The second argument the defendant makes is

12  this Citi Financial part.  It doesn't offer any

13  probative value, but there were statements that were

14  incorrect.  There's nothing in the record that she used

15  the card, and it's grossly overstating this idea that

16  it's clear that she had a card that was in dispute.

17  That is a Citi Financial card that belonged to her

18  husband.  The defendant acknowledged that.  There's no

19  evidence that she used it.  And it's also not clear

20  that it's connected to any specific account.  It

21  certainly has nothing to do with this case.  And I

22  think --

23         THE COURT:  What kind of card can you get

24  that's not connected to any account?  I think I may

25  want to get one of those.

1          MR. BENNETT:  I'm sorry.  It's not connected

2   to the account in this case.

3          THE COURT:  Oh, okay.

4          MR. BENNETT:  And so, Judge, there is no --

5   if those are the only two arguments the defendant comes

6   up with in opposing our summary judgment motion, I

7   think in opposition to significant sworn testimony and

8   the law that this remains the defendant's obligation to

9   establish the affirmative defense of accuracy, that the

10  Court has to grant our motion for summary judgment.

11         It would dramatically simplify the issues at

12  trial, and, candidly, Judge, it should dramatically

13  simplify the assessments of the two sides.  We remain

14  at significant odds in our assessments of the case in

15  our attempts to avoid having a trial on June 11.

16         MR. LYNCH:  Judge, just --

17         THE COURT:  In your view, Mr. Lynch -- what's

18  the name of that lady's testimony that you read?

19         MR. BENNETT:  Ms. McCauley.

20         THE COURT:  Ms. McCauley's testimony.  Why is

21  there any longer a permissible inference that when she

22  signed that application, she was acknowledging that

23  that was her debt?

24         MR. LYNCH:  Because of the language right --

25  I mean, she signed something under oath, and here's the

1 language, Judge.  It says acknowledgment and agreement

2 under her signature that the information provided in

3 the application is true and correct as of the date set

4 forth opposite her signature, and that an intentional

5 or negligent representation of this information

6 contained in this application may result in civil

7 liability and/or criminal penalties.

8          I'm not debating the testimony from

9 Ms. McCauley that the information was taken from the

10 credit report, but you have an obligation before you

11 sign your name saying everything is true in an

12 application to look at that application and determine

13 whether it's true or not before you sign it.  And

14 whatever external pressures everybody believes are out

15 there, that's not evidence in this case.

16          There's other documents that people sign in

17 this world.  When you sign something, and you sign it

18 under penalties of perjury saying it's true and

19 accurate, you have made a statement.  It's admissible

20 evidence.  She's saying it's her account.  And she did

21 not have to do that.  She did not have to apply for

22 this loan.  She did not have to --

23          THE COURT:  I thought Ms. McCauley also said

24 that that information went on there automatically and

25 it did not mean that she was responsible on the

1  account, that it was her debt.  It just meant that it

2  was something that was reflected on her credit report.

3  She was acknowledging the truth of the fact that it was

4  reflected on her credit report, but the lady said it

5  wasn't hers.

6         MR. LYNCH:  That's what Ms. McCauley's

7  opinion is.  That's not what the application says and

8  it's not what the language underneath the plaintiff's

9  signature says.  It says the information is true.

10        THE COURT:  Well, it says it's true that it's

11 reflected on my credit report.  That's the extent of

12 the true there, according to Ms. McCauley.

13        MR. LYNCH:  Well, that's not what the

14 document is.  That's her interpretation of the

15 document.  But she signed something under oath saying

16 the information was true.

17        THE COURT:  All right.  Anything else?

18        MR. BENNETT:  No, sir.

19        THE COURT:  The motion is denied because I

20 can't make that finding that Mr. Lynch says needs to be

21 made in the summary judgment context.  As a finder of

22 the fact based on the evidence that exists, the finder

23 of the fact might very well make that finding, but it's

24 not the role of the Court on summary judgment to make

25 that finding.

1          And while that is a very frail defense to the

2    issue of liability, it is an issue that has to be

3    resolved as a question of fact by the finder of the

4    fact, notwithstanding that it is a frail defense and

5    what might very well be rejected.

6          Motion of the defendant for summary judgment.

7    You're aware, Mr. Lynch, aren't you, that the dismissal

8    of the claims under the Fair Debt Collection Practices

9    Act and the definition of claims are to be tested

10   under Rule 15, not Rule 56?

11         MR. LYNCH:  Yes, Judge.  Actually, I would

12   also think they can be tested under Rule 41 as well,

13   but I'm not --

14         THE COURT:  Well, if they are dismissed, they

15   are dismissed with prejudice.

16         MR. LYNCH:  Correct.

17         THE COURT:  He agrees to that, didn't he?

18         MR. LYNCH:  He agrees to that.

19         THE COURT:  Do you agree to that?

20         MR. BENNETT:  I do.

21         THE COURT:  So they will be dismissed with

22   prejudice under Rule 41.

23         MR. LYNCH:  Okay.

24         THE COURT:  Good.  Done.

25         MR. LYNCH:  Judge, we believe this case

1  presents an issue for this Court to interpret the scope

2  of the Johnson Fourth Circuit case.

3        Judge, I again this morning got up really

4  early, read the Johnson case, read the Westra case, the

5  Malm case, and a case from Oregon that also interpreted

6  the Johnson Fourth Circuit case.

7        And what the plaintiff's position is with

8  respect to Johnson is that any time a consumer

9  reporting agency makes a dispute with an ACDV that the

10 furnisher as an obligation to look at original

11 documents.  That's what plaintiff's attorneys in this

12 case and other cases make Johnson stand for that broad

13 proposition that you cannot have a reasonable

14 investigation unless you looked at original documents.

15        Our position is, and I believe this case is

16 almost factually identical to Westra and Malm, and

17 those cases were decided after Johnson and talk about

18 Johnson.

19        Judge, when you have to evaluate whether a

20 reasonable investigation is done, you have to rely on

21 the information given from the consumer reporting

22 agency and the ACDV.

23        THE COURT:  Why?

24        MR. LYNCH:  Because no information was

25 provided from the plaintiff directly to the furnisher.

1  It was the only information the furnisher received.

2  The plaintiff in this case did not write directly to

3  Palisades and dispute the notation on the credit

4  report.

5          Judge, in some cases that's the case.  If you

6  or me just had a dispute on the credit report, we may

7  write a letter directly to Palisades and say, "This is

8  not my account.  It's fraud.  It's identity theft."

9  There is no communication in this case between the

10 plaintiff and Palisades.  The only communication of a

11 dispute on this account came from the consumer

12 reporting agencies.  And the dispute was a dispute Code

13 1, and it said not his/not hers.

14          And when they did that, they went and they

15 verified the name and the personal identifying

16 information, reported back, and said, "This is the

17 account.  Consumer disagrees."  And that's the case.

18          And in that situation, both Malm and Westra

19 said, Garbage in somewhat, very scant information came

20 in, so that dictated the level of investigation that

21 had to be done by the furnisher.

22          In contrast to that, Judge --

23          THE COURT:  But that's not the rule in the

24 Fourth Circuit.  The Fourth Circuit is that you have to

25 do some degree of careful inquiry, and there's got to

1 be more than a superficial inquiry.  The Fourth

2 Circuit's rule isn't garbage in, garbage out.  That's

3 tough.

4         MR. LYNCH:  Well, Judge, when I said the

5 level of information -- and I'm not saying that's

6 garbage.  The level of the information that's provided

7 through the consumer reporting agencies and what

8 plaintiff provided dictates what a careful review is.

9 The careful review here was to verify that the name of

10 the account was in this person's name and verify it was

11 her account based on the name, the address, the social

12 security number, the personal identifying information.

13         In Johnson, Judge, the reason it was

14 reasonable for a jury to make the determination was

15 because it said, and this is the exact language from

16 Johnson, Judge, in the dispute, "Consumer states

17 belongs to husband only.  Was never a signer on

18 account.  Was an authorized user."

19         In that type of situation or fraud or

20 identity theft -- and, Judge, as I mentioned earlier,

21 Palisades had another account with the plaintiff in

22 this case, the Citi card account, and she complained of

23 fraud and identity theft.  The trade line was

24 immediately removed.  Immediately removed.

25         When the proper information is given about

1  fraud or identity theft or a cosigner on an account,

2  Palisades did the right thing.

3           In this situation, Judge, the only

4  information it got was not his or not hers.

5           THE COURT:  But, Mr. Lynch, don't _Malm_ and

6  _Westra_ both just stand for the proposition that the

7  specificity of the information provided by the customer

8  is one of the factors you take into account in

9  assessing the reasonableness of the investigation?

10 It's not the *sine qua non* that defines the scope of the

11 investigation.  Isn't that what both those cases say?

12           MR. LYNCH:  They say that, Judge, but they

13 are identical to this case when they made rulings on

14 summary judgment because the information that came from

15 the consumer reporting agencies was almost identical to

16 the situation here.  And when you give that scant of

17 information, and both courts said beyond question it

18 could not be determined that it was an unreasonable

19 investigation because the information provided through

20 the consumer reporting agencies by the plaintiff was

21 scant and so insufficient that the investigation that

22 was done by the furnisher as a matter of law was

23 reasonable.

24           And what else could the evidence be?  When

25 you say "not his/not hers," and they go and they

1  identify that this is the account they obtained, and

2  identify all the personal information.  Even if they

3  would have gone to an original document, that wouldn't

4  have answered the question.  They did the level of

5  investigation that was necessary for the information

6  that was provided them.  And there is nothing --

7          THE COURT:  Did they call her?

8          MR. LYNCH:  There's no evidence that they

9  called her, Judge.

10          THE COURT:  Did they call him?

11          MR. LYNCH:  There's nothing that I've seen.

12          THE COURT:  Why isn't that part of a

13  reasonable investigation?  The consumer tells you it's

14  not theirs, it's the husband's.  Why isn't talking to

15  them part of a reasonable investigation to ascertain

16  whether that's true or not?

17          MR. LYNCH:  In the industry, if every time

18  they got just verifying personal information that

19  would, from just business realities, our position would

20  be that that wouldn't be reasonable.  That would be an

21  unreasonable expectation of a furnisher on just a

22  simple -- you look at the codes, Judge, that we

23  attached --

24          THE COURT:  You mean, it would cut the profit

25  margin down because they'd have to pay somebody to get

1  on the telephone.  Isn't that sort of a factual issue?

2  You're saying as a business reality you can't do it.

3  Business reality is about making profits.  You're

4  saying they couldn't afford to do it.  Isn't that a

5  factual issue?

6          MR. LYNCH:  Judge, in the not his/not hers

7  situation, when you look at those codes, all they are

8  asking for is verification of personal identifiers.

9  And that's what the furnisher did.  If you look at the

10  codes that we attached that are used by the consumer

11  reporting agencies, they're a laundry list of codes.

12          THE COURT:  Wait a minute.  You seem to be of

13  the view that the parameters of a reasonable

14  investigation are defined by the practices of the

15  credit reporting agencies and the collection agencies.

16  And I'm not aware of any law that says that's true.

17          Is that relevant?  Certainly it's relevant.

18  Is that the measuring yardstick that we use?  I don't

19  know any case that says that.  Is it?

20          MR. LYNCH:  Judge, the evidence is the only

21  way you get the information is from the consumer

22  reporting agencies.  And I guess what we're asking the

23  Court to rule on summary judgment is does the not

24  his/not hers information require more of an

25  investigation when you have that scant information.

1 And both Malm and Weststra, both those courts with

2 almost identical facts on summary judgment have said as

3 a matter of law that the defendant should prevail.  And

4 we believe those cases are right on point.

5          And when additional information is provided,

6 and the plaintiff in this case, which will be evidence

7 on another account, did provide the fraud and identity

8 theft, and that was an account of her husband, the

9 level of information dictates what type of

10 investigation is necessary.

11          And we believe given the scant information

12 that was provided we'd ask the Court to rule as a

13 matter of law.

14          THE COURT:  When in relation to the dispute

15 in this case was the dispute that the plaintiff made in

16 the other case made?

17          MR. LYNCH:  I'd have to look at that.  It's

18 in the record, Judge.

19          THE COURT:  Was it before or after?

20          MR. LYNCH:  I think it was around the same

21 time, but I'm hesitant to make that statement to the

22 Court.  It is in the record.  I think it was in 2000 --

23 I think it was earlier than 2008.  I do believe that,

24 Judge.

25          Judge, that's our point on the reasonable

1 investigation issue.  We ask the Court to follow Malm

2 and Weststra.  And also the Oregon case that we cited

3 that talks about Johnson.

4          And Johnson, our position, is, Judge, is as a

5 matter of law, the Fourth Circuit does not say for

6 every single dispute that you have to look at original

7 documents.

8          It upheld a jury verdict saying in that

9 situation under those facts, given that notice, and

10 that information provided from the consumer reporting

11 agencies, MBNA, that the jury can find, and the fact

12 finder could find it was an unreasonable investigation.

13          That's all we believe the Fourth Circuit

14 Johnson case -- we believe it's a fact specific case

15 and doesn't stand for any broader proposition.  That's

16 our argument on the liability, Judge.

17          Going now to the next point, Judge, which is

18 the willfulness point, which we believe is even

19 stronger for Palisades in this case.  Given the scant

20 information that was provided, Judge, and looking at

21 the codes from the consumer reporting agency, how can

22 anyone say this was reckless or intentional or knowing

23 because when it's done right, and when the proper

24 information is given to the consumer reporting

25 agencies, on the Citi card account they deleted the

1  trade line.

2          What possibly could be reckless or

3  intentional when the plaintiff through the consumer

4  reporting agency provides such scant information?  How

5  can that be reckless?

6          THE COURT:  Does your argument boil down to

7  the fact again, though, that the measure of what is

8  appropriate in this industry is what the credit

9  reporting information agency chooses to give?

10          MR. LYNCH:  Judge, our standard in this is

11  there's three credit reporting agencies.  And as a

12  furnisher, they provide us the information.  That's not

13  something that the furnisher dictates.  And given the

14  information that's provided, and, again, Judge, there's

15  many cases where the plaintiff --

16          THE COURT:  What is a furnisher?

17          MR. LYNCH:  A furnisher is the creditor.

18  When I say "furnisher," Judge, I mean MBNA or Palisades

19  or the person that's owed the money that's doing the

20  credit reporting agency work.

21          Judge, the only -- and I'm not saying that it

22  is controlled by what the credit reporting agencies do.

23  I'm saying it's controlled by what information is

24  received by my client.  The only information received

25  by my client to dispute this debt was provided by the

1 credit reporting agencies.  And it was not his/not

2 hers.

3          There's other cases, Judge, where the actual

4 Ms. Azzi or Ms. Johnson or another plaintiff would

5 write directly to Palisades and say, This isn't my

6 account.  I've been the victim of identity theft.  It's

7 fraud.  It's my husband's account.  I'm only an

8 authorized signer.  Information like that.

9          When that information is provided, then you

10 have a factual question about whether enough

11 information or an investigation is required, but when

12 you have this just basic information saying, We just

13 need to verify the personal identifiers, and the

14 furnisher reports back, we believe Malm and --

15          THE COURT:  It says that all you have to do

16 is verify the personal identifiers.  What is it that

17 defines that?

18          MR. LYNCH:  That Code 1 from the consumer

19 reporting agency says, "Not hers/not his."

20          THE COURT:  It says, "Not hers/not his."

21 What is it that then says when you get that, all you

22 have to do is to go verify what the personal

23 identifiers are?

24          MR. LYNCH:  That's what we believe is

25 reasonable when you take into account the other codes.

1           THE COURT:  Why do you say that?  Are you

2   saying it's an industry practice?  Are you saying it is

3   your practice?  Are you saying that somebody has by

4   regulation said that that's reasonable?  What is the

5   reason?

6           MR. LYNCH:  It's probably a combination of

7   all those points.  Certainly in the industry, Judge,

8   when you look at the different codes that can be

9   reported from the consumer reporting agency,

10  particularly when you receive no information from the

11  plaintiff, you have to make a decision about what the

12  reasonable response is to that.

13          And both Malm and Weststra said as a matter

14  of law it couldn't be an unreasonable investigation

15  when only that information is provided.  When you're

16  only provided that information -- I mean, if you went

17  to dispute an account and you just said, "This account

18  is not John Lynch's," and they went and looked at John

19  Lynch, and that's the information they got from the

20  creditor, going to the application, going any further

21  than that, especially when John Lynch did not even

22  complain about it, John Lynch never even made any

23  communications to the furnisher at all.

24          THE COURT:  Well, in this instance, the

25  information was sent to the credit reporting agency,

1  right?

2            MR. LYNCH:  Correct.

3            THE COURT:  It says, "It's not my account."

4            MR. LYNCH:  Correct.  She said it wasn't her

5  account.

6            THE COURT:  Somebody has to figure out

7  whether it is or isn't.  What more can a consumer do

8  than to say "It's not my account"?

9            MR. LYNCH:  What more?

10           THE COURT:  Tell me what you expect of them.

11           MR. LYNCH:  I guess what the other

12  jurisdictions looking at this exact issue have said,

13  there's nothing the furnisher can do but what they did.

14           THE COURT:  I'm not quite sure that's the law

15  in the Fourth Circuit.  I'm not sure it's the proper

16  law, period, wholly apart from -- I don't think Johnson

17  has defined that.

18           MR. LYNCH:  I agree, Judge.  I don't think

19  Johnson has defined that either.

20           THE COURT:  What I'm asking you is what more

21  does the person who -- if I have a complaint, I tell

22  the credit reporting agency, "It isn't my account."  I

23  tell them that.  I pick up the phone.  I tell you the

24  same thing.  "It isn't my account."  That's all I can

25  tell you.  "It's not any account.  I don't know

1 anything about it."

2          What more can you do as a consumer than to

3 say "It isn't my account"?  That is to say what is it

4 that you expect that the consumer would do?

5          MR. LYNCH:  I would expect the consumer would

6 do, particularly given the facts of this case, is that

7 this was an account opened by my husband.  She knew

8 that.  She claims that her signature was forged.  And

9 she said that in her deposition.  She said the exact

10 same thing on the Citi card account.

11          I think when you have information that you

12 know that would be relevant to give to the furnisher to

13 help them on their investigation, that you have a duty

14 to provide it.

15          On the Citi card account, why does she say it

16 was fraud?  Why does she say it was an account of her

17 husband's?  Why didn't she just say, "This isn't my

18 account"?

19          THE COURT:  What did she say?  You deleted

20 it.  It was sufficiently convincing to you to delete

21 it.  Your client, I mean.

22          MR. LYNCH:  My client's policy is when

23 someone says it's identity theft or fraud is to delete

24 the trade line.  When you receive information, Judge,

25 asking for verification, you look at it and say, That's

1  the name we have on this account.  And you verify it,

2  and you say, "The consumer disagrees."

3        Then the consumer can come back with the

4  additional information and say why it's not my account.

5  And, Judge, I hope the Court appreciates why we think

6  Malm and Weststra are on point.

7        We, again -- I'm not saying, obviously, it's

8  not controlling precedent in this circuit, but we

9  believe factually both cases were decided on summary

10  judgment.  Both are identical, we believe.

11        I hear the Court on the tensions between who

12  has the burden to provide information.  We believe the

13  information source is the consumer, and that if they

14  had additional information they know of, and they

15  didn't provide it, and they just made a general denial

16  of the account, that it was reasonable as a matter of

17  law for Palisades to say, "Our information is it is

18  your account," and say, "The consumer disagrees."

19        And, Judge, going to the willfulness

20  argument.  Again, given these facts and given this

21  debate on whether the investigation was reasonable as a

22  matter of law, given just that scant information that's

23  provided, where in the world have they produced the

24  evidence?  And they have the burden to create a genuine

25  issue of material fact on willfulness.

1          What they have said very generically is, All
2  of your procedures are bad generally and that means you
3  willfully violated the Fair Credit Reporting Act.
4          First of all, there are cases in other
5  jurisdictions that we have cited to the Court on this
6  identical situation that undermines any reckless or
7  knowingly intentional mistake.
8          Second, Judge, is the situation given the
9  little information that was provided.
10          Third is, look at the plaintiff's own
11  situation when they have another account, and they give
12  all of the information, the fraud and identity theft,
13  and the trade line was deleted.  What evidence do they
14  have to create a genuine issue for the fact finder of
15  any type of willfulness finding?
16          And we'd ask the Court, if the Court is not
17  inclined to grant summary judgment on the liability
18  issue, at least to the grant summary judgment on the
19  willfulness issue when given the facts of this case
20  there's just no evidence to create a fact issue on
21  willfulness.
22          THE COURT:  All right.
23          MR. LYNCH:  Thank you, Judge.
24          THE COURT:  Where in relation to the filing
25  of a dispute or claim, and the dispute in this case,

1 did the action take place in which the defendant

2 deleted the trade line on the Citibank account?  Before

3 or after?

4        MR. BENNETT:  I believe it was before.  I

5 believe it was before.  But it was -- it's not -- the

6 facts are not -- the representation to counsel as to

7 what occurred with that is not -- it's not agreed.

8 There's certainly no evidence to provide the meat to

9 the hypothesis the defendant is offering the Court in

10 regard to that account.  And I would view that more of

11 a question of impeachment, but it certainly wouldn't be

12 probative on these issues now.

13        The defendant also didn't know that.  So that

14 it's not as if the --

15        THE COURT:  Didn't know what?

16        MR. BENNETT:  Well, assume even that the

17 defendant could establish the claim that Mr. Lynch has

18 proffered, which is that she's disputing an account of

19 her husband's that she had a credit card in her purse

20 connected to.  That's all there is.  There's no

21 evidence she used it, applied for it, or the like.

22        THE COURT:  I guess you're looking at it

23 differently than I am, Mr. Bennett.

24        It seems to me that it's relevant in

25 determining the reasonableness of the investigation to

1  see what they did in respect of other investigations.

2  And what they say, Well, all we had was this.  And the

3  "this" is she said it's not hers.

4          What did they have from her when they deleted

5  the trade line in this other account?  If it was the

6  same information, i.e., that it was not her account,

7  and that's all they had, it's goes to their argument on

8  reasonableness.

9          MR. BENNETT:  I understand, and I can provide

10  the factual explanation.

11          The defendant's procedures to handle consumer

12  disputes puts them into different categories.  We have

13  detailed this in our briefing.  95 percent of all of

14  the disputes it receives over a several-year period,

15  sometimes even more than 95 percent some years, but

16  approximately 95 percent consistently are handled

17  exactly the same way.  And that is the way the dispute

18  in this case with the Chase card or account was

19  handled.

20          The other 5 percent deal with a number of

21  categories, three particular categories, one of which

22  is where the CRA reports identity theft or fraud as the

23  exact dispute.  And that's, I think, less than

24  2 percent of the disputes the defendant receives.

25          43 percent are not his/not hers disputes.

1 And a related number are not his/not hers, belongs to

2 my ex-spouse.

3          But in the 95 percent, all that is done is an

4 automated check against the -- it was a human check,

5 but with automating procedures to look at what the

6 electronic accounting record says, and verify back to

7 the CRA when it received the dispute.  And currently

8 it's entirely automated.  The computers -- there are no

9 human beings at all involved.  For 95 percent, it's

10 just that.

11          So the reason why the Citi Financial account

12 was different is that it was coded with a fraud

13 dispute.  And the reason that the defendant is opposing

14 us in this case to the same degree as it is is because

15 it has set up procedures.  If consumer dispute says

16 "fraud," because of the nature of its business, a debt

17 buyer who doesn't maintain documents, and if it has to

18 obtain them, it has to buy them, this is all in the

19 record from Chase, its procedure is as soon as the

20 computer says "fraud," it's deleted automatically.  An

21 investigation is never accomplished.

22          And for the 95 percent of others --

23          THE COURT:  Well, it's just cheaper to do

24 that than to run the risk of a fraud claim, is that

25 what it boils down to?

1          MR. BENNETT:  Yes, sir.

2          Even the other 95 percent, a number of those

3 deal with similar problems that are not fraud.

4          For example, a claim that I already paid the

5 original creditor in full is handled in that 5 percent

6 category.

7          The dispute that Your Honor -- Your Honor

8 honed in on this correctly.  The dispute in this case

9 was all the information my client had.  And even at

10 this moment in time, no one -- we're not possessed.

11 We're not withholding any information from Your Honor.

12 My client is not.

13          THE COURT:  You're giving me way too much

14 information.

15          MR. BENNETT:  Nobody knows for sure that it

16 was a forgery.  All we know is that Mr. King

17 represented in his bankruptcy filing that it was his

18 sole account.  And he had no codebtors and he had no

19 obligors.

20          So to say that --

21          THE COURT:  Is Mr. King going to testify at

22 trial?

23          MR. BENNETT:  I assume.

24          MR. LYNCH:  Yes, Judge.

25          THE COURT:  Where does he live?

1          MR. LYNCH:  He lives here.  I think Glen

2  Allen or in this area.

3          THE COURT:  Okay.

4          MR. BENNETT:  And you've seen the declaration

5  of Mr. King, and he's cooperating with the defendant.

6  And that's the best that he can testify.  He will not

7  testify that my client opened or applied for or used

8  the account.

9          The other issue, Judge -- I mean, if the

10  Court please, I can go through the arguments --

11          THE COURT:  What evidence is there about who

12  signed her name to it?

13          MR. BENNETT:  We don't have any evidence

14  because we only saw the application for the very first

15  time a week or two after -- well, a week after

16  discovery closed.

17          THE COURT:  All right.  Why is it

18  willfulness?  Let's assume there has to be a decision

19  on the facts on the rest of the summary judgment.  Why

20  is there a factual basis under the Supreme Court's

21  decisions on the meaning of willfulness for the case to

22  go forward as a willful claim?

23          MR. BENNETT:  Judge, Your Honor dealt with

24  the reduction or lowering of the threshold for

25  wilfulness between what the Fourth Circuit previously

1    established in the Dalton case versus what Supreme

2    Court established in Safeco when Your Honor ruled on

3    the post-trial motion rule of TransUnion in Mullins,

4    and correctly so, that it's now recklessness is the

5    threshold.

6            Now, knowing violations, conscious disregard

7    is still there, of course, a higher threshold, but now

8    reckless is also included.  A knowing violation isn't a

9    necessary element.

10           Still I can rely on the Dalton decision,

11   which I've cited.  And mind you, you don't have any

12   cites or counterargument of any sort in the defendant's

13   briefing for me to have addressed.  There wasn't any in

14   the original brief.  It was just an assertion of it's

15   not willful and there's nothing in the reply.

16           But we have cited Dalton and the factors that

17   Dalton considered.  And in Dalton, it was an accuracy

18   case against a reporting agency in which the dispute

19   was made, and the day the dispute -- the next day after

20   the dispute was made --

21           THE COURT:  Tell me what the evidence is

22   here?

23           MR. BENNETT:  Removed.  Well, I have to --

24           THE COURT:  I have about another two or three

25   minutes.  Just tell me what the evidence is.

1           MR. BENNETT:  The evidence in Dalton, the

2   factors were whether or not the defendant was aware of

3   the procedures that are attacked as unreasonableness.

4   Certainly it wasn't.  It was not an employee error or

5   mistake.  This was the process and procedure the

6   defendant has implemented and it has been following for

7   sometime.

8           THE COURT:  It's a procedure?

9           MR. BENNETT:  Yes, sir.  It's an intended

10  procedure.  And we don't have to prove they intended to

11  harm.  We have to prove they intended the conduct.

12          The second Dalton factor is the amount of

13  time that the violation occurred.  In Dalton, the Court

14  said it was fixed the next day, but in this instance,

15  Judge, our client had to sue.  And even in suit, it

16  wasn't fixed for a month or so after service.

17          The third factor in Dalton is whether or not

18  there have been notice of other violations.  It doesn't

19  say we have to prove it.  The Dalton language says --

20          THE COURT:  Is there any notice?

21          MR. BENNETT:  There is.  There's 54 lawsuits

22  in which the defendant was sued --

23          THE COURT:  What were the results?

24          MR. BENNETT:  Well, almost every one was

25  settled, but my point is the Dalton decision says

1  "Knowledge of complaints."

2           THE COURT:  So they are put on notice.

3           MR. BENNETT:  Yes, sir.  On top of that you

4  have Johnson, which the defendant truly is

5  acknowledging is the law in our circuit and is

6  attempting to ask the Court to narrow it or to accept

7  the Minnesota District Court decision to the contrary.

8  But Johnson has been in place since 2004, four years

9  before the violation here.

10          In addition, you can attack, as the defendant

11  does in her reply brief, the Federal Trade Commission

12  as not binding on this Court.  That is, a consent

13  decree that was -- well, until Johnson, the law that

14  was considered in 2000 in which a debt buyer was

15  prosecuted by the Federal Trade Commission for

16  verifying based on its electronic records when it did

17  not have the supporting underlying documentations.

18          And whether or not that would be the law in

19  every place or whether a Federal Trade Commission

20  consent decree or docket prosecution is binding on this

21  Court, it was notice to the defendant of the possible

22  recklessness of the conduct.

23          THE COURT:  All right.  Thank you.

24          MR. BENNETT:  Yes, sir.

25          THE COURT:  Anything else, Mr. Lynch?

1          MR. LYNCH:  Judge, just real quick on the

2   recklessness component.

3          I understand when we're dealing with these

4   statutes and facts that reasonable people and

5   reasonable judges and circuits can disagree, but if

6   there's a disagreement on a reasonable issue, where is

7   the evidence of recklessness?  You've got the Weststra

8   decision from the Seventh Circuit.  You've got the Malm

9   decision.  Both of these are three or four years

10  earlier on this exact issue where the Seventh Circuit

11  believed that summary judgment as a matter of law on

12  these facts that Palisades wins.

13         Maybe there is a debate in this area of the

14  law about what a reasonable investigation has to be in

15  liability.  But how in the world can that rise to the

16  level of recklessness when there's cases and judges and

17  circuit courts like the Seventh Circuit from back in

18  2005 on this identical situation saying what Palisades

19  did was okay.

20         And they have no evidence of recklessness.

21  They have said, Oh, your procedures are bad.  You have

22  been sued for other things and this complaint before.

23  But there's no evidence in this case of recklessness.

24         The evidence is what Palisades did on this

25  particular account was reasonable as determined by

1 other judges.  We may have a debate here by this Court

2 and the Fourth Circuit about what Johnson really means,

3 but they don't have the evidence on recklessness given

4 the scant information that was provided.

5          THE COURT:  All right.

6          MR. LYNCH:  And as a matter of law, they

7 don't have the facts to take that to the fact finder,

8 Judge.

9          THE COURT:  All right.  There's a genuine

10 dispute of fact respecting the issues presented by the

11 motion for summary judgment, and the motion for summary

12 judgment will be denied.  The case will be resolved at

13 trial or you'll resolve it in settlement.

14          Go and talk with someone about settling the

15 case now.  Good luck.

16          MR. BENNETT:  Thank you, Judge.

17          THE COURT:  We'll be in adjournment.

18          (The proceedings were adjourned at 11:43

19 a.m.)

20          I, Diane J. Daffron, certify that the

21 foregoing is a true and accurate transcription of my

22 stenographic notes.

23

24          _____    _____

                DIANE J. DAFFRON, RPR, CCR        DATE

25